UNITED STATES BANKRUPTCY COURT    **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |   |
|---|---|---|
| In re: | : | |
| DELTA AIR LINES, INC., *et al.*, | : | Chapter 11 |
| Debtors. | : | Case No. 05 B 17923 (ASH) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |   |
|---|---|---|
| COMAIR, INC., | : | |
| Plaintiff, | : | |
| -against- | : | Adv. Proc. No. 06-1964A |
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, *et al.*, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
**Attorneys for Debtors and Debtors-in-Possession**
**By: John J. Gallagher, Esq.**
  **Robert S. Span, Esq.**
  **Brendan Branon, Esq.**
**875  15th Street, NW**
**Washington, DC 20005**

**COHEN, WEISS AND SIMON LLP**
**Attorneys for Defendant Air Line Pilots Association, International**
**By:  Michael I. Winston, Esq.**
  **Peter D. DeChiara, Esq.**
**330 West 42 Street**
**New York, NY 10036-6976**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

### <u>DECISION ON COMAIR MOTION FOR PRELIMINARY STRIKE INJUNCTION</u>

    By order dated December 27, 2006 in accordance with the Court's Decision dated

December 21 (the "December 21 Decision"), this Court granted the motion of debtor Comair, Inc.

("Comair") under Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113, to reject its collective

bargaining agreement with its pilots (the "pilot agreement") represented by Air Line Pilots Association, International ("ALPA"). Subsequent to Comair's announcement that it planned to implement the terms of its last Section 1113 proposal on or before January 1, 2007, ALPA made it clear that its members will not work under terms of employment not agreed to by the pilots and will conduct a strike if Comair implements new terms of employment. Comair responded on December 22, 2006 by commencing the above-captioned adversary proceeding for injunctive relief and filing the instant motion for a preliminary injunction to restrain ALPA and its members from sponsoring, encouraging or engaging in any strike or job action against Comair in violation of Section 2 First of the Railway Labor Act, 45 U.S.C. § 152 First (the "RLA"). ALPA opposes injunctive relief on the ground that Section 101 of the Norris-LaGuardia Act, 29 U.S.C. § 101 ("NLGA"), deprives the Court of jurisdiction to enjoin a strike in the circumstances presented here.

A hearing on Comair's motion was held on December 28, 2006. At the conclusion of the hearing counsel jointly announced that the parties had reached a "standstill agreement" to defer a decision on the motion for preliminary injunction and to adjourn the hearing to February 1, 2007 in order to give the parties additional time to resolve their differences by negotiation. In the standstill agreement, Comair agreed to defer implementation of new employment terms until February 2. At the February 1 hearing I requested that the parties extend their standstill agreement for one week. The additional time has not produced agreement, and the parties have asked the Court to decide the motion.

## Jurisdiction

This Court has jurisdiction over this adversary proceeding and contested matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and the Standing Order of Referral of Cases to Bankruptcy Judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## **Background**

The background and the details of Comair's Section 1113 litigation with ALPA have been set forth at length in this Court's December 21 Decision granting Comair's motion to reject the pilot agreement. To avoid unnecessary repetition, familiarity with that Decision is assumed. It will suffice here to reiterate that Comair is a regional airline wholly-owned by debtor Delta Air Lines, Inc. ("Delta") which filed for bankruptcy on September 14, 2005 along with Delta and other affiliates. Comair is one of five competitive regional airlines which provide "regional lift" for Delta, each operating under a separate Delta Connection Agreement. Delta is Comair's only customer, although Comair has sought unsuccessfully to compete for regional lift for other major airlines. Comair's pilot costs are the highest in the regional airline industry. Delta has the power to withdraw aircraft from service with Comair and to place such aircraft with competitive Delta Connection regional airlines, and it has done so based upon Comair's uncompetitive cost structure. The pilots are the only Comair employee constituency which has not agreed to any cost reduction since Comair filed for bankruptcy in September 2005.[1] The grounds on which this Court concluded that Comair had established the right to reject the pilots' collective bargaining agreement are aptly summarized in the concluding paragraphs of the Court's December 21 Decision.

The final statutory test, under Section 1113(c)(3) requires the Court to find that "the balance of the equities clearly favors rejection of such agreement."

The trial evidence compellingly demonstrates that the balance of the equities requires rejection of the Pilot Agreement.

No one can be gratified at the prospect of reducing established wages and benefits. No one questions the worthiness of these skilled and dedicated pilots or the heavy responsibilities that they bear in the air. And no one can doubt the economic hardship of pay cuts for some whose family needs may exceed their earning capacity in this job. But it is in the nature of bankruptcy that, as a simple matter of economics and competition, the debtor *cannot* meet pre-petition contract rights and expectations. It is

---

[1]    In January 2006 the Comair pilots ratified a letter of agreement ("LOA") which would have granted Comair's original post-petition request for concessions, conditioned on similar agreements by the flight attendants and machinists. When the flight attendants did not agree to the concessions requested by Comair, ALPA repudiated the pilots' January 2006 LOA. The terms of Comair's final Section 1113 proposal, which was rejected by ALPA, were far more favorable to the pilots than the January 2006 LOA which the pilots ratified.

the essence of a Chapter 11 reorganization that all economic constituencies of a debtor must make their appropriate and proportionate contribution to the debtor's reorganization in order that all may benefit from the continued viability and future success of the debtor.

In this case there is no dispute that Comair's pilot costs are materially higher than the rest of the regional airline industry. This competitive disadvantage has cost the airline dearly since 2003 and threatens the jobs of every employee in the company. Comair has seen its share of Delta regional lift decline from 52% to 32%. Its fleet has been reduced by 21 aircraft and it has been unable to compete for regional lift from other mainline carriers. Last month it lost twelve of its 25 70-seat jets to a competitive Delta Connection carrier. Effective January 1 Delta's annual pilot costs will increase by $8 million annually and it will be required to contribute an additional $3.5 million to its pilot defined contribution plan, all of which will greatly increase Comair's competitive disadvantage.

Finally, the pilots are the only employee constituency which has made no concessionary contribution to Comair's reorganization. Every other labor group, both union and non-union, has made substantial financial sacrifices to support the ongoing viability of the enterprise, except the pilots.

Comair's November 16 proposal is absolutely "necessary." It is proportionate and "fair and equitable." It would leave the pilots in the mid-range of compensation and benefits amongst its competitive regional airlines, and it guarantees pay increases within the four year term and includes "industry leading" profit sharing.

As noted above, this Court cannot make a new agreement for the parties, and both sides must return to the bargaining table if they are to resolve their differences consensually. But on a motion to reject under Section 1113 this Court is called upon to decide whether Comair must continue to perform in accordance with the existing Pilot Agreement during the pendency of their future negotiations, which both sides have assured the Court may last for many months. It is in this context that the Court must be mindful of the context of its decision and the fundamental objectives of Chapter 11.

The objective facts established at trial demonstrate that Comair's pilot wage rates are not competitive and, consequently, that it cannot compete successfully in the highly-competitive world of the regional airline industry. The most dramatic evidence of this is Comair's loss of twelve 70-seat jets to a Delta Connection competitor at a time when the only significant competitive cost disadvantage remaining is Comair's pilot costs. Under the Pilot Agreement that competitive disadvantage will substantially increase upon the new year. The trial evidence leaves no doubt that the prospects for Delta's reorganization and future viability as a competitor in this industry are materially at risk as a result of Comair's existing pilot cost obligations. The sacrifice and, ultimately, jobs of all of Comair's other employee groups cannot be jeopardized by the hold-out of one labor constituency.

On this evidence, the "balance of the equities" requires that Comair be permitted to reject the Pilot Agreement.

### **The Issue; Precedents**

As noted at the outset, ALPA contends that the NLGA deprives the court of jurisdiction to grant an injunction restraining employees from engaging in a strike or job action when an employer imposes new terms of employment after the court authorizes rejection of a collective bargaining agreement under Section 1113 of the Bankruptcy Code. Comair responds that the RLA, which ALPA concedes applies to Comair as a common carrier, trumps the NLGA under the case law, and that an injunction may be issued by the Court to enforce ALPA's duty under the RLA to negotiate in good faith and submit to the mandatory and lengthy procedures under the RLA for mediation. ALPA counters that the provisions of the RLA do not apply to bar a strike or job action where Comair has unilaterally changed the *status quo* by imposing new terms of employment following the Section 1113 rejection of the pilot agreement.

Only three reported decisions have decided the issue thus framed. In *In re Northwest Airlines Corporation*, 346 B.R. 333 (Bankr. S.D.N.Y. August 17, 2006), pending in this Court, the Bankruptcy Court concluded based on the NLGA that the Court does not have jurisdiction to enjoin a strike in the circumstances here presented. On appeal the District Court reversed, concluded that the RLA was applicable on the facts to override the NLGA, and issued a preliminary injunction restraining the union from a strike or job action. *In re Northwest Airlines Corporation*, 349 B.R. 338 (S.D.N.Y. September 14, 2006). The District Court ruling in *Northwest Airlines* is currently on appeal and *sub judice* before the Court of Appeals for the Second Circuit. The third decision on point is that of the Bankruptcy Court in *In re Mesaba Aviation Inc.*, 350 B.R. 112 (Bankr. D.Minn. October 23, 2006), which reached the same result as the District Court in the *Northwest Airlines* case and entered a preliminary injunction restraining the union from any strike or job action. All three of these decisions are lucid and carefully reasoned, and it would be a disservice to the respective courts and to the reader to attempt to summarize them here.

- 5 -

For the reasons set forth below, I agree with the outcome reached by the District Court in *Northwest Airlines* and the Bankruptcy Court in *Mesaba* and have entered an order enjoining ALPA and its members from engaging in or inducing others to engage in a strike or job action.

**Discussion**

**I.**     **The governing statutes and case law**

**A.**     **Section 1113 of the Bankruptcy Code**

Because Section 1113 is central to the determination of this motion, it is useful to set forth the provision in full.

**11 USC § 1113.   Rejection of collective bargaining agreements**

(a)     The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act [45 USC §§ 151 et seq.], may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)     (1)     Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A)     make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B)     provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2)     During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c)     The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

      (1)      the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

      (2)      the authorized representative of the employees has refused to accept such proposal without good cause; and

      (3)      the balance of the equities clearly favors rejection of such agreement.

(d)      (1)      Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application.   All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing.  The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

      (2)      The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing.  In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to.  If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

      (3)      The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e)      If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement.   Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee.  The implementation of such interim changes shall not render the application for rejection moot.

(f)      No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

      Certain observations concerning Section 1113 in the Court's December 21 Decision are

germane to the analysis called for on this motion and bear reiteration:

An unusual if not unique [for the Bankruptcy Code] aspect of Section 1113 is that, as noted in the legislative history and the case law, the statute is designed to force the debtor-employer and its unionized labor constituencies to resolve their disputes by agreement by a process of good faith negotiations.   In most litigated disputes that are not settled, the court makes a decision which resolves and terminates the parties' dispute.   Not so under Section 1113 — the court here does not resolve the parties' dispute and cannot set new terms to govern the parties' relationship.   Only the parties can make a new agreement, and they must resume negotiations to that end whatever the court's ruling on a Section 1113 motion.

*Of course, that is not to say that the court's decision on a Section 1113 motion is inconsequential.   Quite the contrary, the court must decide whether the existing collective bargaining agreement will continue to govern the parties during their negotiations, which have been and may be lengthy, or whether the debtor-employer will have the right to implement a lower cost structure pending the outcome of the parties' ongoing negotiations to enable it to compete effectively in the marketplace.*   (Emphasis supplied)

It is important to bear in mind the context in which this statute operates. Section 1113 is not a labor law, it is a bankruptcy law.  It comes into play only when the employer is a debtor which has filed a petition under Chapter 11 because, if it does not restructure its affairs, it will fail and there will be no jobs for the union to protect and enhance.

Because the ultimate objective of a Chapter 11 case is a reorganized debtor which is financially viable for the long term, the Bankruptcy Code grants to the trustee or debtor-in-possession an array of powerful tools designed to enable the debtor to restructure its affairs.  Restructuring means changing or in some cases even eliminating the contractual rights of creditors and contract counter-parties.  One such tool is Section 365(a), which provides that the trustee or debtor-in-possession, "subject to the court's approval, may . . . reject any executory contract . . . of the debtor."  By case law the standard for deciding a motion to reject an executory contract under Section 365(a) is the business judgment rule, which basically means that if it makes economic sense for the debtor in the judgment of management, the motion to reject will be granted. (citations omitted)

Congress enacted Section 1113 not to eliminate but to govern a debtor's power to reject executory collective bargaining agreements, and to substitute the elaborate set of subjective requirements in Section 1113(b) and (c) in place of the business judgment rule as the standard for adjudicating an objection to a debtor's motion to reject a collective bargaining agreement.

The fact that Section 1113 is a bankruptcy law and therefore instinct with the fundamental objectives of Chapter 11 has consequences for the implementation of the statute, as will be apparent in the discussion which follows.

There is no cross-reference in Section 1113 or elsewhere in the Bankruptcy Code to the

NLGA.  Nor is there any reference in either the RLA or the NLGA to the Bankruptcy Code or, more

- 8 -

specifically, the powers granted to debtors to reject executory contracts under Sections 365(a) and 1113 of the Code.

But there are references to the RLA in Sections 1113(a) and 1167 of the Bankruptcy Code which, taken together, are of some help in divining the interaction of the two statutes.   Section 1113(a) authorizes a debtor-in-possession or a trustee appointed under Chapter 11 to assume or reject a collective bargaining agreement in accordance with the provisions of Section 1113.   However, subsection (a) specifically excludes "a trustee in a case covered by subchapter IV of this chapter [railroad reorganization] and by title I of the Railway Labor Act" from the power to assume or reject.   Section 1167, which is contained in subchapter IV, provides:

### 11 USC § 1167.  Collective bargaining agreements

Notwithstanding section 365 of this title, neither the court nor the trustee may change the wages or working conditions of employees of the debtor established by a collective bargaining agreement that is subject to the Railway Labor Act except in accordance with section 6 of such Act.[2]

Several conclusions must be drawn from these cross-references to the RLA in the Bankruptcy Code.   One is that the Congressional drafters of Section 1113 were quite conscious of the RLA in writing this provision.   More specifically, the drafters were conscious of the interrelationship between the provisions of Section 1113 providing for rejection of collective bargaining agreements and the provisions of the RLA requiring collective bargaining and maintenance of the *status quo*. Section 1113(a) specifically excludes railroad debtors[3] from the power to reject collective bargaining agreements.   But Congress did *not* exclude *airline* debtors from the power (i) to reject under

---

[2]    Although Section 1167 on its face would appear to apply to any debtor which is covered by the RLA, it is apparent from the placement of Section 1167 in subchapter IV and from Section 1113(a) itself that Congress contemplated and intended that non-railroad debtors covered by the RLA, such as airlines, would have the power to reject collective bargaining agreements under Section 1113. No case has been cited holding that Section 1167 applies to carriers other than railroads, and ALPA has not so argued.   The reference in Section 1167 to Section 365 was evidently a cross-referencing oversight when Section 1113 was enacted as the "only" provision governing rejection of collective bargaining agreements.

[3]    Actually, Section 1113(a) excludes only "a trustee in a case covered by subchapter IV," but Section 1163 requires all subchapter IV debtors to have a trustee.

Section 1113 and (ii) to implement new terms and conditions of employment, which is of course the only purpose of rejection. Nor did Congress exempt airline debtors who exercise the power to reject and implement new terms from either the obligations or the protections provided in the RLA. This is significant because it undermines ALPA's alternative argument that the procedures provided in Section 1113 should be construed as superceding or supplanting the extensive and lengthy negotiation and mediation requirements established in the RLA.[4]

      **B.**      **<u>Section 101 of the Norris-LaGuardia Act</u>**

Section 101 of the Norris-LaGuardia Act, 29 U.S.C. § 101, provides in full as follows:

**§ 101.  Issuance of restraining orders and injunctions; limitation; public policy**

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

It is not disputed that NLGA Section 101 generally deprives the courts of jurisdiction to enjoin strikes or job actions against employer-debtors in bankruptcy. Indeed, with respect to employer-debtors not subject to the RLA, the cases which have considered the issue have recognized the employees' right to strike in situations where debtors have obtained bankruptcy court orders rejecting collective bargaining agreements under Section 1113 of the Bankruptcy Code. *In re Royal Composing Room, Inc.*, 62 B.R. 403, 405 (Bankr. S.D.N.Y. 1986), *aff'd,* 78 B.R. 671 (S.D.N.Y. 1987), *aff'd,* 848 F.

---

[4]    Alternatively, ALPA argues that the statutory procedures prescribed in Section 1113 of the Bankruptcy Code should be construed to "supplant" and thus supercede or nullify the duties to negotiate and mediate provided in Section 2 First and Section 5 First of the RLA. I reject this alternative contention as having no statutory foundation in Section 1113. Congress not only had the RLA in mind when it drafted Section 1113, it explicitly excluded railroad carriers from the operation of Section 1113. Had Congress intended that lawful rejection of a collective bargaining agreement in accordance with Section 1113 would exempt an airline carrier and its affected union from the reciprocal duties to negotiate and mediate under the RLA, it is inconceivable that Congress would not have done so explicitly. It is not for the courts to speculate that Congress intended a result for which there is no express or inferential predicate and, incidentally, which would confound the obvious objectives of both statutes. Concerning the congruence between the statutory objectives of the Bankruptcy Code and the RLA, *see* the excellent analyses of the District Court and the Bankruptcy Court, respectively, in *In re Northwest Airlines Corporation*, 349 B.R. 338 and *In re Mesaba Aviation Inc.*, 350 B.R. 112.

2d 345 (2d Cir. 1988), *cert. denied sub nom. New York Typographical Union, No. 6 v. Royal Composing Room, Inc.*, 489 U.S. 1078 (1989); *Sheet Metal Workers' Int'l Ass'n, Local 9 v. Mile Hi Metal Systems, Inc. (In re Mile Hi Metal Systems, Inc.)*, 899 F.2d 887, 893 n.10 (10th Cir. 1990); *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 806 (Bankr. W.D. Ky. 1985); *see also, Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America, AFL-CIO-CLC*, 791 F.2d 1074, 1078 (3d Cir. 1996).

In short, the courts have recognized that there is nothing in Section 1113 or elsewhere in the Bankruptcy Code that overrides the anti-strike injunction provision in NLGA Section 101, even if a strike would thwart the debtor's ability to reorganize and thereby frustrate the bankruptcy objectives of rejection under Section 1113.

But the courts have also recognized that the RLA does override the NLGA so as to permit injunctions against violations of the RLA.

### C.    Relevant sections of the Railway Labor Act

Comair relies on Section 2 First of the RLA, 45 U.S.C. § 152 First.  This statute provides as follows (quoting from 45 U.S.C.):

### § 152.  General duties

### First.  Duty of carriers and employees to settle disputes

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

RLA Section 5 First, 45 U.S.C. § 155 First, provides that the parties or either the carrier or union may invoke the services of the national Mediation Board, or the Mediation Board may proffer its services in any labor emergency, and the Mediation Board "shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to agree-

ment." Failing agreement, the Mediation Board is required to endeavor to induce the parties to submit their controversy to arbitration.

The duty to negotiate in good faith in RLA Section 2 First is no mere hortatory exhortation. This was made clear by the Supreme Court in *Chicago and Northwestern Railway Company v. United Transportation Union*, 402 U.S. 570, 574-577 (1971). The Supreme Court said there:

> The narrow questions presented to us are whether § 2 First imposes a legal obligation on carriers and employees or is a mere exhortation; whether the obligation is enforceable by the judiciary; and whether the Norris-LaGuardia Act strips the federal courts of jurisdiction to enforce the obligation by a strike injunction.
>
> *    *    *
>
> This Court has previously observed that "[t]he heart of the Railway Labor Act is the duty, imposed by § 2 First upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'"
>
> *    *    *
>
> The conclusion that § 2 First is more than merely hortatory finds support in the legislative history of the Railway Labor Act as well.   . . .
>
> *    *    *
>
> Accordingly, we think it plain that § 2 First was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis.

The good faith bargaining and mediation required under RLA Section 2 First is designedly long and drawn out (sometimes characterized by the courts as "almost interminable") in order to delay for as long as possible self-help by either side, including strikes and job actions by employees. *See, Brotherhood of Railway and Steamship Clerks, et al. v. Florida East Coast Railway Co.*, 384 U.S. 238, 246 (1966); *Detroit and Toledo Shoreline Railroad Co. v. United Transportation Union*, 396 U.S. 142, 149 (1969).

- 12 -

The collective bargaining provisions of the RLA are enforceable by court injunctions to prevent either side from self-help until the protracted negotiation and mediation process has run its course in accordance with the statute.   Section 2 First is "a legal obligation enforceable by whatever appropriate means might develop." *Chicago and Northwestern Railway Co.*, 402 U.S. at 577.  As the Supreme Court said in *Consolidated Rail Corporation v. Railway Labor Executives Association*, 491 U.S. 299, 302-303 (1989):

> In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation.  . . .  Until they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions.   The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending com-pletion of the required procedures, without the customary showing of irreparable injury. [citations omitted]   Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force.

To the same effect, *see Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787 (2d Cir. 1980); *Pan American World Airways, Inc. v. International Brotherhood of Teamsters*, 275 F. Supp. 986 (S.D.N.Y. 1967), *aff'd sub nom. Brotherhood of Railway Clerks, et al. v. Pan American World Airways, Inc.*, 404 F. 3d 938 (2d Cir. 1969); *Virginian Railway Co. v. System Federation No. 40, et al.*, 300 U.S. 515, 563 (1937).

Central to ALPA's argument is the proposition that if Comair violates the *status quo* by imposing new terms and conditions of employment following Section 1113 rejection, the pilots will then be free to strike, without identifying for the Court the statutory *status quo* provisions which ALPA claims Comair would violate.   In fact, the RLA contains four provisions which have been referred to as im-posing a duty to maintain the *status quo* in the sense of not changing terms and conditions of employ-ment.  The first such *status quo* provision is to be found in Section 2 Seventh (quoting from 45 U.S.C.):

- 13 -

**Seventh.   Change in pay, rules, or working conditions contrary to
agreement or to section 156 forbidden**

No carrier, its officers or agents shall change the rates of pay, rules, or working
conditions of its employees, as a class as *embodied in agreements* except in the manner
prescribed in such agreements or in section 156 of this title.   (emphasis supplied)

The second *status quo* provision is found in the language of RLA Section 6 which has been italicized here

(quoting from 45 U.S.C.):

**§ 156.   Procedure in changing rates of pay, rules, and working conditions**

Carriers and representatives of the employees shall give at least thirty days'
written notice of an intended change *in agreements* affecting rates of pay, rules, or
working conditions, and the time and place for the beginning of conference between the
representatives of the parties interested in such intended changes shall be agreed upon
within ten days after the receipt of said notice, and said time shall be within the thirty
days provided in the notice.   In every case where such notice of intended change has been
given, or conferences are being held with reference thereto, or the services of the
Mediation Board have been requested by either party, or said Board has proffered its
services, *rates of pay, rules, or working conditions shall not be altered by the carrier
until the controversy has been finally acted upon as required by section 155 of this title*,
by the Mediation Board, unless a period of ten days has elapsed after termination of
conferences without request for or proffer of the services of the Mediation Board.
(emphasis supplied)

The third *status quo* provision appears in the last paragraph of Section 5 First, 45 U.S.C. § 155 First,

which simply provides for a thirty-day cooling-off period after the Mediation Board has notified the

parties that its mediatory efforts have failed.   The fourth *status quo* provision is contained in RLA

Section 10, 45 U.S.C. § 160, which provides for another thirty-day cooling-off period following a report

by the Presidential Emergency Board.

ALPA has not specified which of these provisions it claims Comair would violate by

implementing new employment terms post-rejection.   As amplified below, none of these provisions bars

Comair from implementing new pilot employment terms now that the pilot agreement has been lawfully

rejected.

- 14 -

## II.    Analysis of the parties' arguments

Before turning to the arguments of the parties, a prefatory note may be useful to illumin-ate this Court's approach to statutory dispute resolution.  It is essential to identify precisely the statutory language which is invoked in support of purported statutory rights and obligations, duties and responsi-bilities.  All too often briefs and argument refer in generalities to statutory rules without focusing on the precise language employed by the legislature.   In this case, the parties' briefs and indeed some of the case law frequently refer in general terms to maintenance or violation of the *status quo*, without quoting or even citing the statutory predicate for the purported *status quo*.  The failure to focus with precision on the actual language of the statute undermines a basic precept in statutory interpretation, which is that a provision in a statute must be given effect in accordance with the ordinary and usual meaning of the words employed by the legislature.[5]   Accordingly, I shall endeavor here to focus on the actual language of the RLA which must be the foundation of the positions advocated by Comair and ALPA.

---

[5]    Quoting from *In re Delta Air Lines*, 341 B.R. 439, 445 (Bankr. S.D.N.Y. 2006):

. . .  Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress.  It is not for the court to ignore what the statute actually says, or to employ strained or imaginative interpretations not consistent with the plain and ordinary usage and meaning of the statutory language.  The intent of Congress must be presumed to comport with the plain and ordinary meaning of the words in the statute as Congress wrote it, and it is not for the court to substitute its judgment in the guise of divining Congressional intent through creative "construction."  *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 10, 120 S.Ct. 1942, 1949, 147 L.Ed.2d 1 (2000) (when resolving questions of statutory interpretation, "we begin with the under-standing that Congress says in a statute what it means and means in a statute what it says"); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms."). [Then] Second Circuit Chief Judge John Walker, in an illuminating law review article, quotes the words of Lord Atkinson in stating "[i]f the language of a statute be plain, admitting of only one meaning, the Legislature must be taken to have meant and intended what it has plainly expressed, and whatever it has in clear terms enacted must be enforced. . . ."  John M. Walker, *Judicial Tendencies in Statutory Construction: Differing Views on the Role of the Judge*, 58 N.Y.U. ANN. SURV. AM. L. 203, 205-206 (2001).

Comair's basic position is quite simple.  It is an interstate common carrier subject to the RLA.   RLA Section 2 First imposes on Comair and ALPA the "duty . . . to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier. . . ."   The duty continues until conclusion of the mediation process mandated in RLA Section 5 First.   Under the case law cited in point I C, above, this duty is a legally binding requirement which continues in force until thirty days after the Mediation Board has informed the parties "in writing that its mediatory efforts have failed."  RLA Section 5 First, last paragraph.   The statutory duty on the part of the Union and employees "to avoid any interruption to commerce or to the operation of any carrier" is violated by a strike.   Under the case law, this Court has jurisdiction to enjoin such a strike notwithstanding NLGA Section 101. Thus, Comair argues, this Court should enjoin ALPA and the pilots from a strike or job action which would violate the pilots' duty "to avoid any interruption to commerce or to the operation of any carrier."

Reduced to essentials, ALPA argues that when either side violates the *status quo* mandated by the RLA, the other side must be free to protect itself by the exercise of self-help.  It argues that Comair will violate the *status quo* when it implements new terms and conditions of employment effective midnight February 9 as permitted under the standstill agreement.  When Comair unilaterally imposes the new terms and conditions, ALPA asserts, the pilots must be at liberty to strike or engage in job actions to even the playing field, so to speak, in the interminable negotiations and mediation process required under RLA Section 5 First, relying on *Detroit and Toledo Shoreline Railroad Co. v. United*

*Transportation Union*, 396 U.S. 142 (1969).[6]  But as already noted, ALPA does not identify what *status quo* provision of the RLA it contends Comair is about to violate.

---

[6]     ALPA's reliance on *Detroit and Toledo* is misplaced.   The case involved a dispute between the railroad and the union over an existing collective bargaining agreement.   The railroad sought to implement a staffing location change which was not specifically covered in the collective bargaining agreement but which changed a long-standing practice.  The union invoked the requirement of negotiation under RLA Section 2 First and mediation before the Mediation Board under RLA Section 5 First.  When the railroad "posted a bulletin definitely creating the disputed work assignments," the union threatened a strike.  The railroad then brought an action in the District Court to enjoin the strike, and the union counterclaimed for an injunction prohibiting the railroad from establishing the controversial work assignments.   The District Court denied the railroad's request for injunctive relief and dismissed its complaint, from which no appeal was taken.  But the District Court granted the injunction sought by the union restraining the railroad from establishing new outlying work assignments pending negotiation and mediation in accordance with the RLA, and the Sixth Circuit affirmed the issuance of the injunction against the railroad.  The issue before the Supreme Court was whether staffing and location assignments not actually covered by the collective bargaining agreements were within the scope of the provision in RLA Section 6 that "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by" RLA Section 5.   The Supreme Court held that the controversial staffing and location assignments were within the scope of the provision that "working conditions shall not be altered by the carrier" and affirmed the injunction sought by the union restraining the railroad.   The passage in the Supreme Court's decision relied upon by ALPA is the following *dictum*:

> The [railroad's] interpretation of the status quo requirement is also funda-mentally at odds with the [RLA's] primary objective — the prevention of strikes.  This case provides a good illustration of why that is so.   The goal of the [union] was to prevent the [railroad] from making outlying assignments, a matter not covered in their existing collective agreement.  To achieve its goal, the union invoked the procedures of the [RLA].  The railroad, however, refused to main-tain the status quo and, instead, proceeded to make the disputed outlying assignments.  It could hardly be expected that the union would sit idly by as the railroad rushed to accomplish the very result the union was seeking to prohibit by agreement.  The union undoubtedly felt it could resort to self-help if the railroad could, and, not unreasonably, it threatened to strike.  Because the railroad prematurely resorted to self-help, the primary goal of the [RLA] came very close to being defeated.  . . . If the railroad is free at this stage to take advantage of the agreement's silence and resort to self-help, the union cannot be expected to hold back its own economic weapons, including to strike.  Only if both sides are equally restrained can the [RLA's] remedies work effectively.

396 U.S. at 154-155 (footnote omitted).   ALPA's reliance on this passage is misplaced because, unlike the railroad in *Detroit and Toledo*, Comair's rejection of the pilot agreement and imminent implementation of new employment terms constitute lawful acts approved by a court in accordance with a cognate federal statute which, as amplified below, do not violate any *status quo* provision of the RLA.   It is ALPA's position in this contested matter, not Comair's, that is (quoting the Supreme Court in *Detroit and Toledo)* "fundamentally at odds with the [RLA's] primary objective — the prevention of strikes."

In considering ALPA's argument, it is important to focus on the actual language in the RLA that imposes a duty to maintain the *status quo* on the carrier, on the one hand, and on the union/ employees, on the other.  Both sides have the "duty" to negotiate spelled out in Section 2 First and to mediate until released by written notice from the Mediation Board set forth in Section 5 First.  Both sides have the "duty . . . to avoid any interruption to commerce or to the operation of any carrier" mandated in Section 2 First, which means that the carrier cannot lock out and the employees cannot strike or engage in a job action.   Comair clearly is not threatening to violate any duty required of it under Section 2 First or Section 5.

The statutory *status quo* provisions precluding the carrier from unilaterally making changes in terms and conditions of employment appear in the four provisions (Section 2 Seventh, Section 6, Section 5 First last paragraph, and Section 10) quoted and referred to in point I C, above. Section 5 First last paragraph and Section 10 concern thirty-day cooling-off periods and are not germane here.   Section 2 Seventh and Section 6 apply by their express terms *only* where there is in force an existing collective bargaining agreement which governs the parties' relationship going forward.  Thus, *there is no status quo provision in the RLA that prohibits a carrier from implementing a change in terms and conditions of employment where there is no collective bargaining agreement in force governing the ongoing carrier/employee relationship.*

Given the statutory fact that a carrier's *status quo* obligation to refrain from changing the terms and conditions of employment under RLA Section 2 Seventh and Section 6 applies *only* in a case where there is an enforceable collective bargaining agreement governing the parties' ongoing relation- ship, the crucial question that must be answered is whether an agreement which has been lawfully re- jected in accordance with Section 1113 of the Bankruptcy Code nevertheless continues to act as a con- straint on the debtor/carrier's right to implement new terms of employment, or whether the agreement no longer has such efficacy precisely because it has been rejected.   The meaning, logic and purpose of both

the contract rejection provisions in Section 1113 and the *status quo* provisions in the RLA compel the conclusion that a collective bargaining agreement which has been rejected can no longer constitute an "agreement" within the meaning of RLA Section 2 Seventh and Section 6 such that the proscription in those provisions against changes in terms of employment would apply.

Turning first to the Bankruptcy Code provisions, it is explicitly clear in the language of Section 1113 that Congress contemplated and intended that the collective bargaining agreement which is rejected pursuant to a court order will cease to govern the relationship of employer and employees and that the employer will, indeed must, implement new terms and conditions of employment consonant with the debtor's Section 1113 "proposal," which the Court has found to provide for "those *necessary* modifications in the employees' benefits and protections that are *necessary* to permit the reorganization" (emphasis supplied).   Subsection (e) of Section 1113 even permits the debtor, with court approval, to implement interim changes in the terms and conditions of employment before the collective bargaining agreement has been rejected.  ALPA is correct that rejection under either Section 365 or Section 1113 does not constitute a complete "termination" of the rejected collective bargaining agreement for all purposes.  The rejected agreement does not mystically disappear from existence; it remains "in effect" not for the future, but for the limited purpose of the counter-party's putative pre-petition claim for breach under Section 365(g).  *See Medical Malpractice Insurance Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386-387 (2d Cir. 1997).  As the Second Circuit put it in the *Lavigne* case, "Thus, '[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear.'"   114 F.3d at 387. Section 1113 is forward-looking, and when rejection "frees the estate from the obligation to perform," it necessarily terminates the debtor's obligation to comply with the agreement thenceforth and frees the debtor to implement new terms and conditions which are "necessary to permit the reorganization of the debtor."

The *status quo* provisions in RLA Section 2 Seventh and Section 6, both of which are quoted in full in point I C, above, are also forward-looking. Section 2 Seventh prospectively precludes a carrier from changing "the rates of pay, rules, or working conditions of its employees . . . as *embodied in agreements* except in the manner prescribed in such agreements or in section 156 of this title" (emphasis supplied). Section 6 requires the carrier to give thirty-days' written notice "of an intended [*i.e.*, future] change *in agreements affecting rates of pay, rules, or working conditions*" (emphasis supplied), and the next sentence states that "rates of pay, rules, or working conditions shall [again, in the future] not be altered" pending completion of the Section 5 mediation process. Once again, it is explicitly clear in the language of Section 2 Seventh and Section 6 that the proscription against altering "rates of pay, rules, or working conditions" presupposes the existence of "agreements affecting rates of pay, rules, or working conditions" in force and enforceable in the future between carrier and employees.

Rejection of an agreement under Section 1113 "frees the estate from the obligation to perform" for the very purpose of implementing new employment terms and conditions. Rejection means that as a matter of adjudicated fact and law *there is no longer in force between the parties any agreement* "affecting rates of pay, rules, or working conditions" which "shall not be altered" within the explicit meaning and contemplation of RLA Section 2 Seventh and Section 6.

The Court of Appeals for the Second Circuit has ruled in three decisions that where there is no collective bargaining agreement in force governing the terms of employment between carrier and employees, RLA Section 2 Seventh and Section 6 do not apply, and the carrier is free to institute or implement changes in the terms of employment. The earliest such decision is *Brotherhood of Railway, Airline and Steamship Clerks, et al. v. REA Express, Inc.*, 523 F.2d 164 (2d Cir. 1975), *cert. denied*, 423 U.S. 1017 (1975), *cert. denied*, *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO  v. REA Express, Inc.*, 423 U.S. 1073 (1976). In that case the Bankruptcy Court had held that two collective bargaining agreements were not subject to rejection under Section 313(1) of the Bankruptcy Act,

predecessor of Sections 365 and 1113 of the Bankruptcy Code.   The District Court reversed.   The

principal question considered by the Court of Appeals was whether a collective bargaining agreement

subject to the RLA could be rejected under Section 313(1) of the Bankruptcy Act or whether it could be

modified only in accordance with the provisions of Section 6 the RLA.   The Second Circuit agreed with

the District Court and stated: "[W]e must give effect to both statutes to the extent that they are not

mutually repugnant."   523 F.2d at 169.   After concluding that a debtor subject to the RLA did have the

power to reject a collective bargaining agreement under Section 313(1) of the Bankruptcy Act, the

Second Circuit went on to consider whether the debtor-in-possession which properly rejected a collective

bargaining agreement under the Bankruptcy Act was required to adhere to the terms and conditions of the

rejected collective bargaining agreement while it engaged in mandatory negotiations and mediation with

the union for a new agreement.   The Second Circuit said:

> The question crucial to the present case is whether, in addition to being required
> to bargain with the unions as representatives of the employees, the debtor-in-possession,
> as a new employer, is also obligated to maintain the status quo, i.e., adhere to the terms
> and conditions of employment presently in effect pending negotiations with the unions
> for collective bargaining agreements.

*Id.* at 170.   The Court concluded that REA, as the debtor-in-possession in bankruptcy, "while obligated

as a carrier to negotiate with its employees' collective bargaining representative, is not bound to follow

the elaborate and protracted procedures of § 6 of the RLA before putting into effect its proposed terms of

employment."   *Id.* at 171.[7]

More recently, the Second Circuit has held that, where RLA Sections 2 Seventh and 6 do

not apply because there is at the time no collective bargaining agreement in effect between the parties, the

carrier is free to establish new or modify existing terms and conditions of employment without triggering

a right to strike on the part of the affected employees.   *Aircraft Mechanics Fraternal Association v.*

---

[7]    The Court of Appeals remanded the case to the District Court for further consideration and
findings on the question whether the collective bargaining agreements were sufficiently onerous
and burdensome to warrant an authorization to reject them.

*Atlantic Coast Airlines, Inc.*, 55 F.3d 90 (2d Cir. 1995) ("*AMFA I*"), involved a labor dispute between a

newly-certified union (the "Union") and an airline company (the "Airline").   After commencing collective

bargaining under the RLA, the Airline unilaterally changed certain terms of employment pertaining to the

unionized employees.   The Union sued and sought a preliminary injunction to enforce the *status quo*

during the bargaining process.   The Second Circuit said:

> Sections 2 Seventh and 6 of the [RLA] expressly proscribe changes in wages and
> conditions of employment where an *agreement* is already in effect.   The prohibitions on
> unilateral changes set forth in these sections "are aimed at preventing changes in
> conditions previously fixed by collective bargaining agreements."   (Emphasis in original)

55 F.3d at 93.   In this passage the Second Circuit cited and quoted the decision of the Supreme Court in

*Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 402-03 (1942).   The Court of Appeals continued in

*AMFA I*:

> Where no agreement is in effect, these prohibitions have no application.  *Id.*   On the other
> hand, where a collective bargaining agreement is in effect, the status quo freeze applies
> not only to the express provisions of the agreement, but also to the "objective working
> conditions and practices" not expressly embodied in the text of the agreement.  *Detroit &
> Toledo Shoreline R.R. v. United Transportation Union*, 396 U.S. 142, 145 (1969), 90
> S.Ct. 294, 301, 24 L.Ed.2d 325.   Sections 2 Seventh and 6 of the [RLA] simply do not
> impose an obligation on the carrier to maintain the status quo in the *absence* of an
> agreement.   (Emphasis in original)

55 F.3d at 93.   The Court of Appeals went on to say:

> Further, the authority for enforcing the status quo sought by the Union cannot be
> found in section 2 First.   Under that section, the carrier's affirmative duty to exert every
> effort to make collective agreements — that is, to bargain in good faith — does not
> require that it refrain from exercising "its authority to arrange its business relations with
> its employees" where no collective bargaining agreement is in effect.  *Williams*, 315 U.S.
> at 402.   . . .

*     *     *

> We next consider the Union's argument that an injunction freezing the status quo
> is warranted by section 5 of the [RLA], 45 U.S.C. § 155, because the parties had invoked
> the service of the Mediation Board prior to the Airline's unilateral changes in the
> mechanics' terms of employment.   As quoted fully above, section 5 indeed prohibits
> changes in "the rates of pay, rules, or working conditions or established practices in effect
> prior to the time the dispute arose."   But this prohibition is expressly triggered only upon

- 22 -

the Mediation Board's notification to the parties "that its mediatory efforts have failed"
— which did not occur here — and lasts "for thirty days thereafter."

*Id. at 93, 94.*   Finally, the Court of Appeals rejected the Union's argument based on public policy:

> The Union insists that public policy favors its interpretation of the [RLA's] status
> quo provisions.   Whatever the merits of the Union's views on public policy, the essential
> holding of *Williams* remains good law and controls the outcome of this case:  A newly
> certified union that has no collective bargaining agreement with the carrier is not entitled
> to a status quo freeze under the [RLA].

*Id.* at 94.

Following the Court of Appeals decision in *AMFA I*, the union sought a declaratory

judgment to establish that it had the right under the RLA to respond to the airline's unilateral action in

imposing new terms and conditions of employment with self-help in the form of a work stoppage.  Once

again the District Court decision denying the relief sought was affirmed by the Court of Appeals.  *Aircraft*

*Mechanics Fraternal Ass'n v. Atlantic Coast Airlines*, 125 F.3d 41 (2d Cir. 1997) ("*AMFA II*").  After

reiterating its conclusions in *AMFA I* that none of the four *status quo* provisions constraining unilateral

changes by a carrier in terms of employment applied because of the absence of a collective bargaining

agreement in effect between the parties, the Second Circuit said:

> Because none of the status quo provisions apply, our sole inquiry is limited to
> whether, in the absence of bad faith on the part of the Airline, the Union may engage in a
> strike, consistent with its obligation under Section 2 First to make "every reasonable
> effort" to reach agreement and to avoid interruption to "the operation of [the] carrier."  45
> U.S.C. § 152 First.   We agree with the district court that a strike is inconsistent with the
> Union's duty to negotiate in good faith under the RLA in the absence of a finding of bad
> faith on the part of the employer.  Although the good faith bargaining provision also
> applies to the Airline, in *AMFA I* we held:
>
> > "Under [Section 2 First], the carrier's affirmative duty to exert every
> > effort to make collective agreements — that is, to bargain in good faith
> > — does not require that it refrain from exercising 'its authority to arrange
> > its business relations with its employees' where no collective bargaining
> > agreement is in effect."

125 F.3d at 43-44.  The Second Circuit concluded as follows:

> The right to strike does not arise in the absence of employer bad faith.  Here, the
> Airline did what the law permitted it to do.   As we noted in *AMFA I*, 55 F.3d at 93, the

- 23 -

Union has not alleged that the Airline bargained in bad faith, and the Union has con-
tinued to refrain from making such allegations.   Obviously there has been no court
finding of bad faith.   Accordingly, the Union cannot legally strike.

*Id.* at 44.

### Conclusion

For the reasons set forth in point II, above, Comair's motion for a preliminary injunction

must be granted.   To summarize, Comair has been granted the right to reject the pilot agreement and the

correlative right to impose new terms and conditions of employment by a decision and order of this

Court.  Comair's rejection and imposition of the terms of its Section 1113 proposal may be characterized

as "unilateral" in the sense of non-consensual, but not in the sense of *ex parte*, unlawful, in bad faith, or

with unclean hands.  ALPA had and has exercised its full and fair rights to contest the Section 1113 pro-

ceeding and to appeal.

Because Comair is a common carrier subject to the RLA, both Comair and ALPA and the

pilots are bound by and must comply with the terms of the RLA.  Comair's exercise of its right to seek

rejection under Section 1113 of the Bankruptcy Code did not violate any provision of the RLA, and

ALPA has not contended otherwise.   Nor will Comair's Court-approved right to implement new employ-

ment terms and conditions.  A debtor's power to impose the terms of its court-approved Section 1113

proposal, which the court has found to be "necessary to permit the reorganization of the debtor," is the

objective, indeed the sole objective, of rejection under Section 1113.

ALPA has declared unequivocally that its members will not work under terms not agreed

to and will strike or engage in a job action if Comair imposes its Section 1113 proposal.  A strike or job

action unquestionably would violate the statutory duty under RLA Section 2 First "to avoid any interrup-

tion to commerce or to the operation of any carrier."  ALPA's only response of substance is that Comair's

imposition of the terms of its Section 1113 proposal would violate the *status quo* provisions of RLA

Section 2 Seventh and Section 6 prohibiting the carrier from offering rates of pay, rules, or working

conditions pending the negotiation and mediation procedures prescribed by the RLA.   ALPA's argument

must be rejected.   As explained above, the RLA *status quo* provisions ALPA must rely upon have

application only where there is an agreement in force and enforceable which governs the ongoing

relationship between the parties and precludes alteration of the terms and conditions of employment.

Rejection of a collective bargaining agreement under Section 1113 means precisely that the carrier's

future obligation to comply with the agreement is terminated (rejection "frees the estate from the

obligation to perform," as the Second Circuit put it in *Lavigne*), and the carrier is therefore free to impose

the new terms of its Section 1113 proposal which the bankruptcy court has expressly found to be

"necessary."   Consequently, after rejection there no longer exists an "agreement" which constrains the

carrier's right to alter the terms of employment within the contemplation of RLA Section 2 First and

Section 6.   Where there is no agreement within the meaning of those Sections of the RLA, the Second

Circuit has concluded in the *REA* case, *AMFA I* and *AMFA II* that the carrier is free to impose new terms

and conditions without violating any provision of the RLA and without triggering any right to strike on

the part of the union or its members.

Section 1113 was enacted by Congress with full awareness of the RLA, as shown in

Section 1113(a) and Section 1167.   The foregoing analysis is the only construction of the governing

provisions of each statute which gives full effect to the plain meaning of the words used in each statute

and, at the same time, comports fully with the Congressional objectives and policies reflected in each.   To

interpret these statutes as urged by ALPA must give rise to conflicts between the statutes as they are

written and the Congressional objectives underlying both, a consequence to be avoided under the authori-

ties and analyses in the opinions of the District Court and the Bankruptcy Court, respectively, in

*Northwest Airlines* and *Mesaba Aviation*.

Accordingly, Comair's motion for a preliminary injunction is granted.   Counsel for the

parties are instructed to agree upon a form of order consistent with this decision and with my oral rulings.

- 25 -

Needless to say, counsel's agreement to the form of the order I have mandated is without prejudice to

ALPA's right to appeal from the order in its entirety.

Dated: White Plains, NY
       February 7, 2007


                                                     _____/s/ Adlai S. Hardin, Jr._____
                                                            U.S.B.J.